**In re Brian J. ORR, Debtor.**

**Bankruptcy No. 98–67073.**

United States Bankruptcy Court, N.D. New York.

March 25, 1999.

---

Saperston & Day, P.C., Rochester, NY, for debtor, David H. Ealy, of counsel.

Solomon & Solomon, P.C., Albany, NY, for State Employees Federal Credit Union, Douglas M. Fisher, of counsel.

Lynn Harper Wilson, Syracuse, NY, for Chapter 13 Trustee.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

This matter is before the Court on the motion of Brian J. Orr ("Debtor"), filed on January 22, 1999, requesting an order finding the State Employees Federal Credit Union ("SEFCU") in contempt of court based on an alleged violation of the automatic stay and awarding actual damages in the amount of $4,114.87, attorney's fees of $3,500 and punitive damages in the amount of $5,000 ("Contempt Motion"). Opposition to the Contempt Motion was filed on behalf of SEFCU on January 25, 1999. In its opposition, SEFCU requested that the Court treat its response as a "cross-mo-

tion" seeking relief from the automatic stay. The Debtor filed a reply in opposition to SEFCU's "cross-motion" on January 29, 1999.

In the interim on January 27, 1999, SEFCU filed a formal motion seeking relief from the automatic stay pursuant to § 362(d)(1) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code") to allow it to exercise a right to set .off certain account funds on deposit with it against a loan obligation of the Debtor to SEFCU. SEFCU bases its request on the Debtor's alleged failure to seek its consent or authorization of the Court to use cash collateral on deposit with SEFCU postpetition pursuant to Code § 363(c)(2).

Debtor's Contempt Motion was heard on February 2, 1999 at the Court's regular motion term in Syracuse, New York, and adjourned to February 16, 1999, the date on which SEFCU's motion for relief from the automatic stay was noticed to be heard.[1]

Following oral argument, both motions were submitted for decision by the Court on February 16, 1999.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of these motions pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(G), (K) and (O).

### FACTS

The Debtor filed a voluntary petition pursuant to chapter 13 of the Code on November 4, 1998. According to Schedule F, attached to the Debtor's petition, SEF-CU holds an unsecured claim of $1,496 based on a personal loan.[2] According to

---

1. SEFCU's motion did not appear on the February 16, 1999 calendar because no opposition was filed to it. At the hearing on February 16, 1999, the Court agreed to accept the Debtor's reply to SEFCU's "cross-motion", filed on January 29, 1999, as opposition to SEFCU's motion to lift the automatic stay.

2. According to the proof of claim filed by SEFCU on December 22, 1998, it was owed $1,225.81 as of the date the Debtor filed his petition. There is no indication on the proof of claim .that SEFCU is asserting that it is secured by collateral (including a right to setoff). See Item 5 of Proof of Claim.

the terms of the LoanLiner Voucher and Security Agreement signed by the Debtor on or about February 20, 1998, he agreed that "all advances under this Plan will be secured by the shares and deposits in all joint and individual accounts you have with the credit union now and in the future." *See* Attachment to SEFCU's Motion for Relief from the Automatic Stay, filed January 27, 1999.

At the time the Debtor filed his petition, there was $762.80 in his share checking account with SEFCU and $27.42 in his savings account, or a total of $790.22 ("Accounts"). *See* Exhibit A of Debtor's Contempt Motion. On November 7, 1998, there was $147.93 in the Debtor's checking account as a result of the Debtor's withdrawal of funds in the form of checks and ATM transactions. *See id.* On November 9, 1998, and November 24, 1998, the Debtor's payroll checks in the amount of $878.94 were deposited directly into the checking account. On or about November 25, 1998, SEFCU alleges it first received notice of the Debtor's bankruptcy and proceeded to close the Debtor's checking account and to transfer the existing balance of $1,029.28 from the checking account to his savings account for a resulting balance of $1,056.70. *See id.* As is its policy, SEFCU then froze $790.22 of the funds (the petition date balance in the Accounts) in the savings account, leaving a balance in the account available to the Debtor of $265.48.[3] *See* Exhibit B of Debtor's Contempt Motion.

### ARGUMENTS

It is the act of freezing the Debtor's account, which, of course, included postpetition deposits, that is the basis for the Debtor's motion seeking damages based on a finding that SEFCU was in violation of the automatic stay. At the time the Debt-

or made his motion, SEFCU had not sought relief from the automatic stay to allow it to set off the monies owed to the Debtor based on the deposits in the Accounts with SEFCU against those owed to SEFCU based on the loan it had made to the Debtor. The Debtor contends that until he was able to terminate the automatic deposit of his paychecks he was forced to borrow monies to pay his rent and to make his first plan payments because the Accounts were frozen.

As a matter of policy, SEFCU indicates that in a chapter 13 case it merely maintains the administrative freeze on any accounts of a debtor until sufficient funds are received from the chapter 13 plan to replace the funds on hold. It admits that usually it is only when a debtor attempts to use what it considers cash collateral or seeks relief pursuant to Code § 362(h) that the credit union files its motion for relief from the automatic stay. *See* SEFCU's Reply to the Contempt Motion, filed January 25, 1999, at ¶ 20. It justifies this approach by asserting that it saves time and expense in connection with what is usually a nominal amount left in a debtor's account when he/she files a petition; otherwise, it will not seek relief from the automatic stay unless it determines that the amount on deposit with it will "significantly or materially effect the confirmation of a chapter 13 plan." *See id.* at ¶ 21.

SEFCU alleges that as of the commencement of the case $790.22 on deposit with it represented cash collateral. SEFCU takes the position that Debtor's postpetition withdrawals to a low of $147.93 in his checking account was a violation of Code § 363(c)(2) which requires that the Debtor seek the consent of SEFCU or authorization of the Court before using cash collateral. SEFCU contends that un-

---

**3.** According to a letter dated December 3, 1998, from Elizabeth M. Thurnau, SEFCU's Vice President of Legal Services, and addressed to Debtor's counsel, it is SEFCU's policy to deny a debtor all financial services upon receipt of the bankruptcy notice. As a result, all monies in the Debtor's checking account were transferred to his savings account and $265.48 allegedly was available to him for withdrawal. *See* Exhibit B of Debtor's Contempt Motion.

der Code § 105 the Court has the authority to grant it a replacement lien allowing it a secured claim to the extent of $790.22. It seeks the right to setoff $147.93 [4] and to receive payments through the plan on the balance of its claim.

## DISCUSSION

■ In defense of the Debtor's motion seeking to hold SEFCU in contempt for allegedly violating the automatic stay, SEFCU argues that the Debtor is in violation of Code § 363 for having withdrawn monies from the his checking account post-petition without seeking consent of SEFCU or authorization of the Court. Code § 363(c) provides that

(1) If the business of the debtor is authorized to be operated under ... 1304 of this title and unless the court orders otherwise, the trustee may ... use property of the estate in the ordinary course of business without notice or a hearing. (2) The trustee may not use, sell or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

While Code § 363(c)(2) requires that a debtor obtain the consent of any entity that has an interest in the cash collateral, as defined in Code § 363(a),[5] or obtain authorization from the court to use it, the section makes it clear that those requirements are applicable only with respect to transactions involving the operation of a business of the debtor as set forth in Code § 363(c)(1). *See In re Rio,* 55 B.R. 814, 817 (Bankr.M.D.Ala.1985); *In re Wicks,*

176 B.R. 695, 698 (Bankr.E.D.N.Y.1995), *aff'd* 215 B.R. 316 (E.D.N.Y.1997); *but compare In re Kleather,* 208 B.R. 406, 414 (Bankr.S.D.Ohio 1997) and *In re Lough,* 163 B.R. 586, 588 (Bankr.D.Idaho, 1994) (both concluding that the monies on deposit in the debtor's accounts constituted cash collateral). In this particular case, there has been no suggestion that the Debtor is operating a business. In fact, according to Schedule I, attached to the Debtor's petition, he is a nurse employed by SUNY Health Science Center in Syracuse, New York.

A close reading of the facts of *Kleather* leads the Court to conclude that the debtor in that case was involved in operating a business. Specifically, the security agreement executed by the parties provided for a security interest in, *inter alia,* the debtor's accounts receivables, contract rights and chattel paper, all of which are indicative that the debtor was engaged in the operation of a business. The court in *Lough* relied on two chapter 11 cases, in which both debtors were operating businesses, in concluding that the monies of the chapter 13 debtor held on deposit with the creditor were cash collateral for its security interest which arose as a result of a right to setoff. *See Nat'l Bank of Georgia, Inc. v. Air Atlanta, Inc. (In re Air Atlanta, Inc.),* 74 B.R. 426, 427 (Bankr. N.D.Ga.1987) and *In re Williams,* 61 B.R. 567 (Bankr.N.D.Tex.1986). So too, the two cases cited by SEFCU, *Kenney's Franchise Corp. v. Central Fidelity Bank,* 22 B.R. 747 (W.D.Va.1982) and *In re Gazelle, Inc.,* 17 B.R. 617 (Bankr.W.D.Wis. 1982) both involved corporate debtors that had filed chapter 11 petitions.

As noted above, the Debtor is not operating a business. The Court agrees with

---

4. Since there were also monies in the Debtor's savings account of $27.42, the balance in the Debtor's Accounts actually never reached below $175.35.

5. "In this section, 'cash collateral' means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

the findings in *Wicks* and *Rio* and concludes that Code § 363(c)(2) is inapplicable. If, as SEFCU argues, the monies on deposit represented cash collateral, the Debtor was not required to seek SEFCU's consent or authorization of the Court in order to withdraw those monies.

▮ The Court would also point out another fallacy in SEFCU's argument that the monies in the Accounts constituted cash collateral in which, as of the petition date, it had a security interest based on the LoanLiner Agreement which entitles it to a replacement lien in the monies deposited postpetition. As noted by the Supreme Court in *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), upon depositing monies into the Accounts, a debtor-creditor relationship was created between SEFCU and the Debtor whereby SEFCU promised to pay the Debtor upon demand. *See Strumpf*, 116 S.Ct. at 290. The monies became property of SEFCU and the Debtor became entitled to a contract claim against SEFCU for the amount on deposit. *See In re Bakersfield Westar Ambulance, Inc.*, 123 F.3d 1243, 1246 (9th Cir.1997) (citations omitted). SEFCU could not have a security interest in monies that belonged to it, however. If SEFCU had a security interest, it was in an intangible chose in action. *Id.*

To create a valid security interest, the LoanLiner Agreement must contain a description of the collateral. *See* New York Uniform Commercial Code § 9–203(1)(a). In this case, the LoanLiner Agreement makes no reference whatsoever to a security interest in choses in action. Therefore, SEFCU's purported collateral is not sufficiently described, and no valid security interest attached to it. *See id.* Accordingly, SEFCU's request for a replacement lien based on its argument that the monies in the Accounts constituted cash collateral in which it had a security interest based on the LoanLiner Agreement is rejected.

▮ Pursuant to Code § 506(a), SEFCU did have a secured claim to the extent that it has a right to set off its debt to the Debtor at the time the petition was filed against the debt owed to it by the Debtor under Code § 553. *See In re Homan*, 116 B.R. 595, 601 (Bankr.S.D.Ohio 1990). Code § 542 requires that SEFCU pay the debt to the Debtor, i.e. turnover the monies in the Accounts, "except that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. § 542. The ability to offset the debt, however, is subject to Code § 362 and requires that SEFCU seek relief from the automatic stay if it is to exercise its right of setoff. *See id.* at 602.

▮ As of November 4, 1998, SEFCU had a right to set off its claim to the extent of monies on deposit in the Debtor's Accounts to which the Debtor had a claim, namely $790.22, with the balance of its claim being unsecured. During the alleged three weeks prior to receiving notice of the Debtor's filing, SEFCU voluntarily released the funds in the Debtor's checking account, thereby waiving whatever setoff rights it may have had to the full amount of the monies on deposit on November 4, 1998. *See In re Crispell*, 73 B.R. 375, 380–81 (Bankr.E.D.Mo.1987) (citations omitted). On November 25, 1998, when SEFCU transferred the monies from the Debtor's checking account to his savings account, it was entitled to impose an administrative freeze with respect to only $175.35, all that remained of the date-of-filing balance in the Accounts because all other monies on deposit at that time constituted postpetition wages to which it had no entitlement.[6] *See Kleather*, 208 B.R. at 414 (noting that "right of setoff cannot exist in postpetition deposits."); *In re Samuels*, 31 B.R. 120, 122 (Bankr.Pa.1983) indicating that " 'The filing of the petition

---

6. In addition to other property specified in Code § 541, in a chapter 13 case earnings from services performed by a debtor after the commencement of the case are included in property of the estate. *See* 11 U.S.C. § 1306.

marks the time at which mutuality ceases; and any money thereafter deposited is considered property of the debtor or his estate.'" (quoting *In re All–Brite Sign Service Co., Inc.*, 11 B.R. 409 (Bankr.W.D.Ky. 1981)). The fact that SEFCU denied the Debtor access to any monies in excess of $175.35 was a wilful violation of the automatic stay. The fact that SEFCU delayed almost two months after it imposed the administrative freeze before seeking Court authorization to set off the $175.35 is also a basis for the Court concluding that SEF-CU was in further violation of the automatic stay. The Supreme Court made it clear that an administrative freeze is permissible and does not violate the automatic stay as long as it is only a *"temporary* refusal of a creditor to pay a debt that is subject to setoff against a debt owed by the bankrupt." *See Strumpf,* 116 S.Ct. at 290 (emphasis added). Noteworthy is the fact that in *Strumpf* the creditor filed a motion for relief from the automatic stay within five days of placing an administrative hold on the debtor's account. In this case, SEFCU made no effort to seek relief from the automatic stay until the Debtor filed its Contempt Motion. Under SEF-CU's policy of maintaining the hold on the funds in a debtor's accounts without seeking relief from the automatic stay in most cases, it appears that SEFCU is electing to supplant its judgment for that of the bankruptcy court in deciding what will or will not "significantly or materially effect the confirmation of a chapter 13 plan." In this case, the two month long administrative freeze, in the view of this Court, was more than a *temporary* refusal to pay a debt and, therefore, violated the automatic stay. *See Wicks,* 215 B.R. at 319, citing 11 U.S.C. § 362(a)(7).

In *Wicks* the debtors filed a chapter 13 petition on August 16, 1994, and three days later the credit union placed an administrative freeze on the debtors' accounts. It was not until after the debtors filed a motion on November 2, 1994, pursuant to Code § 362(h), that the credit union cross-moved for relief from the automatic stay. The district court upheld the findings of the bankruptcy court that the administrative hold was by no means temporary and might have continued indefinitely but for the Wicks' action in seeking to have the credit union held in contempt for violating the automatic stay, as is the case herein.

To conclude that an entity such as SEFCU is entitled to maintain a freeze or hold on a debtor's account indefinitely without seeking relief from the automatic stay would make Code § 362(a)(7) superfluous. Ultimately, it is for the Court to determine whether an entity has a right to setoff that it may exercise. The Court concludes that based on SEFCU's violation of the automatic stay, the Debtor is entitled to be compensated for actual damages, as well as for costs and attorney's fees incurred in connection with this motion. The Court does take issue with SEFCU's policies. However, because this is the first instance in which a problem has been brought to this Court's attention as a direct result of this policy, the Court finds that punitive damages are not warranted under the circumstances.

While the Debtor has requested $4,114.87 in actual damages and $3,500 in attorney's fees, the Court will require a breakdown of these in order for it to determine the reasonableness of the request.

Based on the foregoing, it is hereby

ORDERED that SEFCU's motion seeking relief from the automatic stay is granted to the extent of allowing it to setoff $175.35 in the Debtor's savings account; it is further

ORDERED that SEFCU's request for a replacement lien in the amount of $790.22 is denied; it is further

ORDERED that the Debtor's request pursuant to Code § 362(h) is granted to the extent of awarding actual damages and reasonable attorney's fees; it is further

ORDERED that the Debtor's request pursuant to Code § 362(h) seeking punitive damages is denied; and it is finally

ORDERED that the Debtor provide the Court and counsel for SEFCU with a breakdown of the actual damages claimed to have been incurred by the Debtor as a result of the unauthorized hold of $614.87, as well as any costs and attorney's fees claimed to have been incurred in connection with Debtor's Contempt Motion within thirty (30) days of the date of this Order.